Good morning, Your Honors, and may it please the Court, my name is Noah Barron on behalf of Appellant DeWitt Lambert. As a housekeeping matter, I'd like to reserve two minutes of time for rebuttal. Manager on time. Thank you. Words matter. When Congress specifically limits arbitration to instances where appropriate and authorized by law, that matters. When Congress enacts a statute to protect employees from signing away their rights and from discrimination in contract, that matters. When Congress goes out of its way to exceptionally provide a judicial forum for those claims, that matters. Section 118 of the Civil Rights Act of 1991 limits arbitration to instances where appropriate and authorized by law, and that means, under this Court's precedent, that this Court must apply Gilmer, looking to the text, legislative history, and fundamental purposes of the underlying statute. Counsel, doesn't your analysis, though, of the Civil Rights Act of 1866 run afoul of loose forward, which, I want to quote this, it held that the legal landscape encompassed by the phrase, to the extent authorized by law, must include both Gilmer and the FAA. I added the last three little bits there. Why does it not include Gilmer and the FAA? Thank you, Your Honor. To the contrary, we do argue that the text, to the extent authorized by law, includes Gilmer and the FAA. Gilmer examined and interpreted the FAA in relation to the ADEA. And what we're saying is that if Section 118 incorporates Gilmer by reference, then Section 118 cannot mean that Gilmer must be then applied to Section 118 itself, which would be a self-referential loop. What we're saying is that Section 118 requires the courts to take Gilmer, defines that as the relevant analysis for claims such as those under Section 1981, and then apply it to the underlying statute so that there can be a genuine consideration of the text, legislative history, and fundamental purposes. How do you apply the loose forward analysis to what you just said? Well, if I understand your question, Your Honor, what we're saying is that under loose forward, that case determined that the text of Section 118 was clear, that there was no need to proceed to the legislative history of Section 118 because it wasn't ambiguous, right? Right. It clearly says that what the Court must do is look to Gilmer and the current legal landscape. And that means that in order to effectuate all the terms of Section 118, and it means all the terms to the extent authorized by law and appropriate, that that analysis must be applied to the underlying statute, not just to Section 118. Wouldn't the analysis be the same for Title VII and 1981? With respect, Your Honor, I don't think that's true. Why is that? Section 1981 and Title VII are vastly different statutes with entirely different enforcement mechanisms and scopes. Title VII was enacted, and this Court noted in Ziober, for example, that the timing of when a statute enacted is crucial. So Title VII and the statute at issue in Ziober, the U.S.C.R.R.A., were both enacted at a time when arbitration of employment discrimination claims was commonplace and well after the Federal Arbitration Act, whereas Section 1981 is a very different statute. It was enacted in a different context as a result of the failure of the Freedmen's Bureau tribunals, which are similar to arbitration, well before the Federal Arbitration Act, over a half-century before that, and at a time when employment arbitration was extraordinarily rare, which meant that Congress was of the presumption that claims, unless stated otherwise, would not be arbitrated. Does that answer your question, Your Honor? Okay. And I would also like to highlight briefly that this Court held in both Ashby and in Lye that Section 118 is not an unfettered endorsement of arbitration. It is limiting. Opposing counsel would have this Court believe that because the word encouraged exists in Section 118, that arbitration is encouraged in all instances without differentiation. But that's not so, as this Court's own precedent recognizes. Furthermore, the legislative history of Section 1981 reflects an unusual preoccupation with the provision of a judicial forum. So it's not just that the Congress wanted to use the Federal courts to enforce the statute, but rather that they both wanted to use the Federal courts to enforce the statute and saw access to the Federal judiciary as an essential component of equal American citizenship, which they sought to provide through Section 1981 and the related acts in the 1866 Act. Furthermore, Congress enacted Section 1981 in part because it viewed as a failure other means of enforcing the civil rights of black Americans. So, for example, the Freedmen's Bureau tribunals, Congress received testimony regarding those and was informed that in some instances, black employees were worse off than they were under slavery as a result of the failures of these tribunals. And so Congress said, well, this is unacceptable. We need a specifically Federal, specifically public judicial forum by which to effectuate the rights of black Americans. And that's why they enacted Section 1981. Which leads me to the fundamental purposes analysis, Your Honors. One of the primary purposes of Section 1981 was to provide a judicial forum. Congress created Section 1981 because it recognized that there was a need for an alternative to the other forums available at that time, the Freedmen's Bureau tribunals or State courts. And in this respect, this is also important for the deterrence. Section 1981 has a goal of deterrence and is enforced in a manner distinct from any other civil rights statute. Unlike Title VII, unlike the ADEA, unlike the ADA, Section 1981 allows recourse only for individual litigants. Individual litigants, unlike Title VII, unlike all these other statutes that have been compelled to arbitration, is enforced exclusively by individual litigants, and they have no ability to report a violation to the EEOC or any other governmental agency. They have no ability to have that statute enforced on their behalf by any government agency, which is not bound by arbitration. And so if Section 1981 claims can be compelled to arbitration, the effect would be that individual litigants bound by arbitration would have no recourse outside of a conference room in an office building. And that means that due to the confidential and private, both in the sense of nonpublic and private in the sense of confidential nature of arbitration, that there would be no public docket, no press coverage, no availability of individuals to witness the proceedings or the testimony. And that means that both in terms of specific deterrence and in terms of general deterrence, that the effects of Section 1981 would be fatally undermined. In fact, one of the primary considerations of employers is to avoid public embarrassment through press coverage. That is one of the main drivers of settlement. And so to allow employers to avoid public embarrassment entirely, unlike Title VII, where the government could still enforce those claims without resort to arbitration, would completely gut the statute. And if there are no questions, Your Honor, I would like to reserve the remainder of my time. Roberts. Thank you, counsel. Goldstein. Thank you. Oaks. May it please the Court. I'm Danielle Oaks for the appellee, Tesla, Inc. We know from Gilmer that appellant's burden is to show that Congress intended through its text to preclude mandatory arbitration or if, and only if, the text is ambiguous through the legislative history or the purpose, a conflict with the purpose of the statute, to prohibit mandatory arbitration. An appellant hasn't done that analysis or made And the very first problem with this analysis that appellant advances is agreement upon what text needs to be analyzed. In this case, the claim that was asserted was pursued under Section 1981 as amended. That's the statute, not the 125-year-old 1866 Civil Rights Act from the Reconstruction era. That's not the statute that appellant pursued his claim under. Yet what he's asking this Court to do is to skip the analysis, skip the textual analysis, or if there is a textual analysis, go all the way back to the statute that is not the one that is present in this lawsuit, and then also skip the fact that the applicable text is unambiguous and go into the legislative history, and not the legislative history of the applicable text, but the legislative history of the 125-year-old statute, and despite that the text is unambiguous, go back to the purpose, not of the applicable statute, but of the 125-year-old statute. And that's a fundamental problem. Now, the language that appellant found in the 1991 Civil Rights Act that amends Section 1981. It amends not just Section 1981, but it also amends Title VII. And one of the important things about the section of the CRA, Section 118, is that it amends both Title VII and 1981 in precisely the same way. Now, that the CRA has many different provisions in it, and those provisions amend all different portions of the existing employment discrimination statute. So the CRA amends Title VII, it amends 1981, it amends the ADEA, it amends the ADA, but in Title I of Section 118 of the CRA, it chooses to, in a uniform way, amend both Title VII and 1981 with respect to its encouragement of arbitration. And the specific language is, where appropriate and to the extent authorized by law, the use of ADR, and I'm paraphrasing, including arbitration, is, quote, encouraged to resolve disputes arising under the acts and the law amended by this title. So we would posit how can the Court interpret this language differently with respect to different statutes? The interpretation needs to be consistent throughout. Now, has there been an interpretation of this language? There have been 20 years of interpretations of this language, and this Court itself grappled with this very language, first in Duffield, in which it reached one contrary interpretation. This Court was not happy with its analysis in Duffield and overruled itself in the Duffield case. It grappled precisely with what does where appropriate and authorized by law mean. This Court has already decided the issue. What it decided it means is that it incorporates the legal landscape that was present at the time that the 1991 Act was amended or enacted, which was Gilmer. And we know what Gilmer says. Gilmer supports mandatory arbitration of employment discrimination, statutory employment discrimination claims. Now, the — there are several cases that address this throughout the country, although, admittedly, there aren't that many circuit-level cases that grapple with this analysis precisely. But part of the reason for that, I posit, would be that it's been decided. It's been decided for years that 1981 claims are arbitrable. If you take a look at the chronology here, in 1998, just after Duffield, the Third Circuit in Seuss said, we don't agree with Duffield. We believe that the where appropriate language simply means that we're appropriate under the FAA. In 2000, just a few years later, the California Supreme Court in the landmark case of Armendariz also said, we don't agree with Duffield. We believe that the where appropriate and authorized by law language means the arbitrability issues, the reasons why arbitration clauses may not otherwise be enforceable. And then three years after that, this Court issued its decision in Luce adopting or affirming the conclusions in both Seuss and Armendariz, citing those cases specifically, and also agreeing with this interpretation of the where appropriate authorized by law. Years after that, in 2009, the U.S. Supreme Court in 14 Penn Plaza concluded without a lot of analysis, but nonetheless in footnote 6, that this same language in 118 meant, quote, it encourages the use of arbitration for dispute resolution. And then just recently in 2014, this Court in Ashby v. Archstone again grappled with what is the meaning of that language and determined that it meant that an employee must knowingly waive his statutory remedies, which is consistent with the precedent before that, which is the where appropriate and as authorized by law really refers to the other reasons an arbitration agreement might not be enforceable, either under the FAA, under principles of unconscionability, under other contract principles because the agreement was not knowing. There are many reasons an arbitration agreement might not be enforceable, but none of those reasons renders the ability to use mandatory arbitration in employment prohibited. And part of the other problem that we have with the positions advanced by Appellant is that they sort of roll right over the analysis, the order of analysis that ought to take place, because not having shown that the text is unambiguous, there isn't any basis for going into the legislative history. So why are we talking about the legislative history? And, incidentally, the legislative history that would need to be discussed, if any at all, would be the legislative history of Section 118, which amended in 1981. How is it possible that a court would evaluate the legislative history but choose not to look at the legislative history that is the most recent amending the statute and that most recent legislation encourages the use of arbitration? Incidentally, there's not very much legislative history about Section 1981 because for years it wasn't perceived to actually apply, A, to private conduct. For at least 50-plus years, or almost 100 years, from 1866 to around 1968, there was a generalized perception that it applied to actions under the color of law. That was clarified in 1968. But also, it wasn't clear that it applied to employment claims. While there wasn't a pronouncement that it did not apply, there also wasn't use of the statute in that way. So it was unclear, and that didn't come about until the 70s when the Supreme Court explicitly acknowledged that, yes, it applies to private transactions and it applies to private employment. So this begs the question, how is it possible that this older statute that appellants advance could have possibly intended to preclude the use of mandatory arbitration in employment when that concept wasn't even conceived of at the time? Moreover, even if you accept appellants' argument that somehow Congress should be excused from not knowing how to prohibit this option, it certainly had a chance to prohibit it when it enacted the FAA in 1935, or it had the opportunity to prohibit it in the 70 years after that. And it chose not to. Its first pronouncement on this issue in the 125 years since the 1866 Act was in 1991. And what did it say? We encourage arbitration. Thank you. Roberts. Thank you, counsel. May it please the Court. Respondent raises a number of points, none of which have significant merit. For example, Respondent talks about how this Court cannot reach the legislative history or fundamental purposes of Section 1981 because somehow the text is unambiguous. But for several reasons, that's not the case. First, Section 1981 was enacted well prior to the Federal Arbitration Act, and the Federal Arbitration Act was enacted prior to the Federal Arbitration Act. So if we were to do a legislative analysis, if there were any to be done, we would focus on the amendment period rather than 1866? With respect, Your Honor, I don't think that's the case necessarily. And why is that? Well, Section 118 is Congress explicitly staking out a position as to when, as to what arbitration should be done with in regards to those statutes. So Pelley is saying, well, Congress can only say yes or no, thumbs up, thumbs down. But we're saying is Congress can do whatever it wants. Congress can say, well, arbitration is encouraged in some instances, but only when appropriate and authorized by law. And authorized by law has to mean something. It can't just mean, oh, well, the standard contract offenses, which would exist regardless. And this Court recognized in Ashby that it is limiting language. And so the analysis has to be, okay, Section 118 sets forth what Congress's opinion is as to arbitration of these claims. And so then the Court has to analyze the underlying statute of, okay, well, let's look to the text. Let's look to the legislative history. Let's look to the fundamental purposes of Section 1981, not of the statute that set the terms of the analysis. Kennedy, that, of course, only look at the legislative history. If you find that the statute itself is ambiguous, right? Do you agree with that? I'm sorry, Your Honor. Do you agree with that? Well, Your Honor, I would note that while this Court did do that and out do that approach in Luce, the test set forth in Gilmer says text, legislative history, or fundamental purposes. And in fact, in Gilmer, the plaintiff there conceded that there was nothing in the text or legislative history of the ADEA that precluded arbitration. He focused only on the fundamental purposes. And as a last note, I would like to note that Section 118 is among the Reconstruction Era Civil Rights Acts, which the Supreme Court has held to be unique, and that the dominant characteristic of those acts is that they belong in court. Thank you, Your Honor. Thank you, counsel. Thank you both for your arguments today. The case just argued to be submitted for decision and will be in recess for the morning. All rise.
judges: Thomas, M. Smith, Vratil